**In re A. FASSNACHT & SONS, INC., Debtor.**

**Richard P. JAHN, Jr., Trustee in Bankruptcy, Plaintiff,**

**v.**

**Suzanne FASSNACHT, Defendant.**

**Bankruptcy No. 1–80–02267.
Adv. No. 1–82–0130.**

United States Bankruptcy Court,
E.D. Tennessee.

Jan. 21, 1986.

See also 45 B.R. 209.

Richard P. Jahn, Jr., Jahn & Jahn, Chattanooga, Tenn., for plaintiff.

Thomas E. Ray, Ray & North, Chattanooga, Tenn., for defendant.

RALPH H. KELLEY, Bankruptcy Judge.

The trustee in the bankruptcy of A. Fassnacht & Sons, Inc., brought this suit against Suzanne Fassnacht to recover an "insider" preference. 11 U.S.C. § 547. As the statute applies to this case, the trustee can recover only if Suzanne Fassnacht had reasonable cause to believe the company was insolvent at the time of the transfer. 11 U.S.C. § 547(b). Trial was held first only on that issue.

The transfer in question involved securing and repaying a $100,000 loan that came about as follows.

A. Fassnacht & Sons filed a petition in bankruptcy in November, 1980. It had been in business in Chattanooga for more than 100 years. Its business was selling and installing truck equipment such as beds, van bodies, utility bodies, hydraulic lifts, tool boxes, etc.

The business had always been owned and operated by members of the Fassnacht family. The defendant, Suzanne Fassnacht, is the wife of John Fassnacht. They were married in 1948. In 1965 he became president of the company and was president when it filed its bankruptcy petition in November, 1980.

Suzanne Fassnacht became a member of the board of directors in 1971 and continued on the board through the time of filing of the bankruptcy petition. She was also elected treasurer and assistant to the president in 1976 and held those titles until June, 1980, or perhaps up to the filing of the bankruptcy petition in November, 1980.

John's and Suzanne's son, Rick, also worked in the business. He became vice-president in 1971 and was vice-president until his resignation immediately before the bankruptcy petition was filed in November, 1980. Rick's wife, Vikki, also worked for the company until the spring of 1980. She handled accounts receivable and accounts payable.

John's and Suzanne's daughter married Chip Misgen, a psychologist by training, who went to work for the company in June, 1980.

John's brother, Father Carl, was also on the board of directors.

The business had operated for some time before 1979 at a location on 13th Street in Chattanooga. Near the 13th Street location was a parcel of real property owned by C & E Enterprises, a company made up of John Fassnacht and his brothers and sisters and their spouses.

In 1977 or 1978 the business moved from the 13th Street location to a new location in the St. Elmo section of town.

In the summer of 1979, Rick Fassnacht asked Suzanne Fassnacht if her aunt, Bess Cason, would lend the company some money. Suzanne told Rick to ask her himself. Rick approached her about a loan when she came to visit in 1979. She declined to lend the money directly to the company but agreed to lend it to Suzanne. She told John to make arrangements with her trust officer at a Florida bank.

In return for the loan, Suzanne executed a promissory note that was made due six months after Bess Cason's death, apparently so that the debt could be set off against Suzanne's inheritance if it was not paid before then.

Suzanne then lent the money to the company and took a promissory note from the company as evidence of the debt. John intended that the company's debt to Suzanne be secured by the company's old business property on 13th Street. John had also decided to have the company's other debts to family members or to C & E Enterprises secured by the 13th Street property. Through an error, the deeds of trust to secure all the debts described the property belonging to C & E Enterprises, rather than the company's old 13th Street business location. The deeds of trust were recorded in July and August, 1979.

John Fassnacht discovered the error in late 1979 and brought it to the attention of his attorneys. In December, 1979 corrected deeds of trust were recorded to secure all the debts except the $100,000 debt to Suzanne.

In the summer of 1980, John Fassnacht knew that the Tennessee Valley Authority was interested in buying the 13th Street business property. He began getting it ready for sale. He then discovered that the deed of trust of the property to secure the $100,000 debt to Suzanne had not been corrected. He had a correct deed of trust prepared. It was recorded on June 19, 1980.

The property was sold in September, 1980, and the $100,000 debt to Suzanne was paid in full from the proceeds, as was a $5,000 secured debt to C & E Enterprises.

Under the preference statute, the lien created by the correct deed of trust was transferred when the deed of trust was recorded in June, 1980. 11 U.S.C. § 547(e). The question is whether Suzanne Fassnacht had reasonable cause to believe the company was insolvent when the deed of trust was recorded.

The trustee makes a three point argument. He argues (1) that Suzanne Fassnacht herself had reasonable cause to believe the company was insolvent, (2) that John Fassnacht had reasonable cause to believe the company was insolvent and his knowledge should be attributed to Suzanne because he acted as her agent in the transaction in question, and (3) that reasonable cause to believe the company was insolvent should be attributed to Suzanne because she was an officer and director of the company.

For the purpose of considering the trustee's arguments, the court assumes that the company was insolvent at the time of the transfer.

■ Of course, reasonable cause to believe a debtor is insolvent does not mean actual knowledge of insolvency. Reasonable cause to believe means that the creditor had knowledge of facts sufficient to indicate to a reasonable person that the debtor was insolvent or that the creditor had knowledge of facts that should have led it to inquire and a reasonable inquiry would have revealed the insolvency. 3 Collier on Bankruptcy ¶ 60.53 (14th ed. 1975).

The proof in this case showed numerous facts readily available to Suzanne Fassnacht that would have shown that the company was in financial difficulty.

In early 1979, the company had a $50,000 line of credit from American National Bank. In March, 1979, the company borrowed another $100,000 from American National Bank. The proof was unclear as to how this $100,000 was used by the company. Apparently, it was used in the general operations of the business.

The company tried to borrow another $100,000 from American National Bank but was turned down. The bank referred the company to Manufacturers Hanover Trust in the hope that Manufacturers Hanover would take the Bank out by refinancing the debt. Manufacturers Hanover was not willing to lend $250,000, apparently because it was too small an amount.

After being unsuccessful with Manufacturers Hanover, Rick Fassnacht asked Suzanne about borrowing money from her aunt, Bess Cason. Rick told Suzanne and Bess Cason that the company was doing fine but was in a cash flow bind or shortage.

In 1979 the company was also behind in paying its accounts payable. The delay became longer as time passed. The company was generally paying no later than 60 days in early or middle 1979 but this grew to more than 90 days by the end of 1979. Beginning in the spring of 1980, the company would write checks to pay bills to suppliers but would hold them until the supplier called to demand payment or until accounts receivable were collected to cover the check. The time from receipt of an invoice until the check cleared the bank was around four to five months.

John Fassnacht denied that he knew how bad the accounts payable problem was in

mid-1980. He may not have known while Rick's wife Vikki, was still working for the company. But Loretta Bridges, who was also a bookkeeper for the company, testified that after Vikki left in April or May, 1980, she personally told John Fassnacht that the company was writing checks to pay bills and holding them until the creditors demanded payment.

At times in 1980 the company would not have enough money to meet its payroll when the checks had already been written. Loretta Bridges would hold the checks while Vikki Fassnacht collected enough accounts receivable to cover the checks. The company never failed to pay a payroll.

In the middle of 1980, some suppliers, but not everybody, were selling to the company only on a C.O.D. basis. These were not major equipment suppliers such as Reading or Midwest. Reading did, however, begin requiring payment for the preceding shipment before it would send another shipment.

In late, 1978, the company owed a large old debt to a supplier, Peabody-Galion. The debt was evidenced by a promissory note for about $23,000. The company also owed Peabody-Galion for other purchases on open account. The principal amount of the open account debt was about $76,000. Apparently the company paid the promissory note debt in full in late 1978. At the same time it also agreed to pay the open account debt in six equal monthly installments. Peabody-Galion agreed to this, except that it requested a seventh payment of $10,000 to satisfy the debt for accrued interest totaling $21,000.

The company paid three of the six installments but missed the March, 1979 installment. In April, 1979, Peabody-Galion sent a letter inquiring about payment of the remaining installments. John Fassnacht wrote back saying that collections were slow and asked Peabody-Galion's indulgence in awaiting payments.

Almost four months later, in late August, 1979, the company still had not paid any of the remaining installments. Fred Barnett of Peabody-Galion talked to Vikki

Fassnacht by telephone with the result that a payment of $2,500 was made in early September, 1979. On September 11, 1979, Fred Barnett wrote a letter demanding immediate payment in full or the account would be turned over to Peabody-Galion's attorneys for collection. In June, 1980, the company still had not paid the remainder of the debt.

The financial statement for 1979 showed a net operating loss of about $34,000. This financial statement was presented at the annual directors' meeting on June 24, 1980. Suzanne Fassnacht was at that meeting. The monthly financial statement up to the end of May, 1980 showed a loss so far in 1980 of about $8,700.

John Fassnacht's salary was cut in half in 1979. Suzanne definitely knew about this. The company also let some employees go about June, 1980 in order to reduce overhead and also for cause in some cases.

The facts suggest that John Fassnacht suspected the company was failing, if not insolvent. John decided to use the old business property on 13th Street to secure not only the $100,000 debt to Suzanne but also the company's other debts to family members or to his family's C & E Enterprises. The $100,000 that Suzanne lent to the company was used in December, 1979 to pay $50,000 on the debt to American National Bank, a debt that John Fassnacht guaranteed. Even though the debt was also secured, the collateral was insufficient to pay the balance after the $50,000 payment. John Fassnacht had to pay about $17,000 on his guarantee. John and Rick Fassnacht both said the $50,000 payment was demanded by the bank but the bank officer who handled the account testified that he didn't demand payment and the file didn't show any demand. Another $10,000 from the $100,000 lent by Suzanne was paid on a debt to C & F Enterprises in March, 1980.

Furthermore, the $100,000 was received about the time Peabody-Galion was demanding payment in full of the old open account debt. But rather than use the $100,000 to pay this debt or any other trade

debt, the money was simply put in a savings account where it sat until the $50,000 was paid to American National Bank. The remainder was then put into a certificate of deposit and was not used until $10,000 was paid to C & E Enterprises on March 26, 1980. Only then was the remainder of the money put into the operation of the company.

The facts clearly show favoritism. Debts were paid to insiders or for the benefit of family members. These were paid ahead of debts to trade creditors, especially Peabody-Galion. At the time of these payments the company was in obvious financial difficulty. It appears that John Fassnacht was making a point of paying the company's debts to family members when he knew or should have known that the company was not paying its trade debts from its regular income.

John Fassnacht denies this. He says that he had nothing to do with the $50,000 payment to American National Bank. Rick Fassnacht apparently wrote the check. He also says that he didn't know that the $10,000 paid to C & E Enterprises was from a deposit of the money lent to the company by Suzanne Fassnacht. The court also notes that the incorrect deed of trust to secure the $10,000 debt to C & E was actually executed in September, 1978, though not recorded until July, 1979. The incorrect deed of trust to secure the $5,000 debt to John and Suzanne Fassnacht was prepared in April, 1979 and recorded in July, 1979. The incorrect deed of trust to secure the $100,000 debt to Suzanne was recorded in August, 1979. John Fassnacht argues that at these times the company's financial condition appeared to be good and the recording of the correct deeds when the company's condition had worsened was only the correction of a mistake. The preference statute, however, requires the court to focus on the facts when the correct deed of trust to secure the $100,000 debt to Suzanne was recorded in June, 1980.

■ The trustee must prove that John or Suzanne Fassnacht had reasonable cause to believe the company was insolvent in June, 1980. Financial difficulties, cash flow problems, or even inability to pay debts as they mature, are not the same as insolvency under the preference statute. For purposes of the preference statute, insolvency means the debtor's liabilities exceed the value of its assets. 11 U.S.C. § 101(26)(A). The trustee must show that John or Suzanne Fassnacht had reasonable cause to believe the company's liabilities exceeded the value of its assets. On this point the Fassnachts' defense is that other facts reasonably led them to the conclusion that the company was solvent. Obviously the company's problems were sufficient to put John and Suzanne Fassnacht on inquiry as to the company's solvency before or at the time of the transfer. Their defense is also intended to show that a reasonable inquiry would not have revealed the company's insolvency, assuming it was insolvent. What would a reasonable inquiry have revealed?

John and Rick Fassnacht testified that as of June, 1980, they did not expect the company to fail. The company's employees who testified also said that they did not expect the company to fail or at least did not hear any talk about the company being likely to fail. Roger Bennett said that he would not have solicited sales of $30,000 to $40,000 if he had thought the company was insolvent, by which he meant about to fail.

Rick and John Fassnacht were both of the opinion that the company was suffering only a temporary cash flow problem caused by a decline in sales that was in turn caused by a general economic downturn. Neither was especially worried by the $34,000 loss for 1979 or the $8,700 loss for the first five months of 1980. John Fassnacht testified that the company had suffered losses during previous bad times but had continued in business. The 1979 financial statement showed that the company had a net worth of $129,000 despite the $34,000 loss. The trial balance dated May 30, 1980 showed the $8,700 loss for 1980, but also showed a net worth of $120,000.

The 1979 financial statement was prepared by Charles Strain. He was the company's accountant from the mid or late

1960's through 1979 and into 1980. The 1979 financial statement was unaudited as were all the financial statements he prepared for the company. He testified that in June, 1980 he knew times were difficult but he was not worried about the financial condition of the company. He did not hear members of the Fassnacht family express concern about the continuation of the business but did hear "usual" references to the tight cash flow. He was aware that the company was slow in paying some vendors and was buying COD from others. If he had been asked in June, 1980, he would have said the company was solvent.

The 1979 financial statement showed an increase in sales of about $150,000 over the 1978 total. John Fassnacht explained the company's borrowing in 1979 as being prompted by the company's expansion and good prospects. The company won trips from suppliers in both 1979 and 1980 for being a leading customer in the preceding years. John and Suzanne Fassnacht took one of the trips, to Greece, in March, 1980.

Loretta Bridges, the bookkeeper, testified that if anyone had asked her about the company's financial condition in June, 1980, she would have shown them the May 30, 1980 trial balance, which showed a net worth of about $120,000. Rick Fassnacht testified that at the time he saw no reason to go behind the May 30, 1980 trial balance to determine the company's true financial condition. He also testified that he believed the June, 1980 trial balance was correct when he saw it. It showed a net worth of about $111,000.

An annual directors' meeting was held on June 24, 1980. The 1979 financial statement was presented at the meeting. The directors were not especially worried by the $34,000 loss for 1979. As to the company's problems, the discussion concerned getting the management together and increasing sales.

Lack of direction from the management was a major problem with the business. Rick Fassnacht had begun running the business around 1975 or 1976 when his father became unable to run it full time because of illness.

John Fassnacht stayed away from the business almost completely during the summer of 1979 when he and Suzanne were staying at Beersheba Springs. In the fall, he and Suzanne moved back to their home on Lookout Mountain. He began to come to the business more regularly, but only for two or three hours a day on two or three days of the week.

The decline in sales began in the fall of 1979. John and Rick Fassnacht clashed over which one was running the company. Rick did not think his father should try to run the company on a part-time basis but his father still would not allow Rick to decide how the company should respond to the economic downturn.

Rick in effect withdrew from the battle from January through May, 1980 by going to Kingsport, Tennessee to open a branch dealership. Rick was always of the opinion that the company had to find new customers to cover the decline in sales to its regular big customers, who were primarily truck dealers. Besides opening the Kingsport office, the company was trying to sell directly to government agencies or corporations such as TVA. When Rick returned, the battle resumed but at least it was recognized as a problem.

Chip Misgen was brought into the company about June, 1980 in the hope that his training as a psychologist would allow him to mediate between John and Rick. Someone also decided that the management should hold regular operational meetings. One was held on June 19, 1980. Loretta Bridges testified that at the time no one was acting like the company was going to fail. The meeting was held to discuss generating more sales to keep the company going. The problem that was mentioned was cash flow. Another operational meeting was held on July 10, 1980. The discussion again involved generating more sales.

Rick Fassnacht had also advocated reducing overhead by laying off employees. In June and July, 1980, Harold Davis, the sales manager, and Jerome Blevins, the

parts manager, and several shop employees were laid off.

Rick Fassnacht testified that all of the truck equipment industry was suffering at the time. Several had gone out of business. The truck dealers that were their regular big customers were not selling trucks. One dealer, Ken Gardner Ford, had itself gone into bankruptcy. He talked to other equipment dealers who also thought the recession would be short and that the way to survive was to cut back and make money from repairs. There was no particular alarm about the company's future at the June, 1980 operational meeting.

The trustee's proof of insolvency in another adversary proceeding in this case focused primarily on a financial statement prepared by Chip Misgen. It reduced the value of the company's inventory to the point that it showed the company to be insolvent. The accuracy of this financial statement was hotly contested, but without regard to its accuracy, it was prepared *after* the date of the transfer in question. At best, it would be evidence that the company was insolvent, which would tend to show that the officers or directors should have known or could have found out that the company was insolvent. The court, however, has assumed that the company was insolvent at the time of the transfer.

The question is what information was available at the time that would have revealed the company's solvency or insolvency. The financial statement prepared by Chip Misgen was not available. The 1979 financial statement was available. Charles Strain testified that its inventory total was consistent with other balance sheet totals. The May 30, 1980 trial balance was also available and showed the company to be solvent.

■ On these facts the court cannot say that Suzanne Fassnacht herself or through John Fassnacht as her agent had reasonable cause to believe the company was insolvent when the correct deed of trust was recorded in June, 1980. John and Rick Fassnacht honestly believed the company's

assets were sufficient to pay its debts. They had no particular reason to doubt the accuracy of the 1979 financial statement or the trial balances through May, 1980. All of them showed that the company had a positive net worth. Charles Strain had been the company's accountant for many years. He believed the company was solvent in June, 1980. The facts required John or Suzanne Fassnacht to make a reasonable inquiry into the company's financial condition. If the company was insolvent in June, 1980, it could have been discovered only by an inquiry far beyond the reasonable inquiry that was required. The Fassnachts were not hiding their eyes from facts clearly showing insolvency. What they saw were facts showing financial problems but not insolvency, and if they had made a reasonable inquiry, they would not have discovered the company to be insolvent. Thus, the trustee cannot recover from the defendant under the preference statute.

The court does not especially like the result. The company owed at least one old business debt that was not being paid. It was not paying its ordinary business debts on time because it was losing money. The Fassnachts ran the company and knew what was happening. They in effect used the company's property to pay debts to family members or their businesses ahead of business debts to innocent third parties. The preference statute, however, does not penalize this kind of behavior. The test of insolvency is not whether the debtor was paying its debts on time but whether its liabilities exceeded its assets. In this case, the defendant did not have reasonable cause to believe the company's liabilities exceeded its assets at the time of the transfer.

The trustee also contended that he should be allowed to avoid the transfer as a common law preference. Recovery, however, should depend on the director's or officer's knowledge or reasonable cause to believe that the corporation was insolvent. 19 Am.Jur.2d, Corporations § 1574 (1965); 19 C.J.S., Corporations § 1391 (1940).

Thus, the trustee also cannot avoid the transfer as a common law preference.

Having held in the defendant's favor, the court need not consider the jurisdictional questions raised by the defendant.

The court will enter an order accordingly.

This memorandum constitutes findings of fact and conclusions of law. Bankruptcy Rule 7052.